[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 15-10958

_____

MICHAEL A. MCGUIRE,

Plaintiff-Appellant
Cross Appellee,

_versus_

STEVEN T. MARSHALL,
DERRICK CUNNINGHAM,
JOHN RICHARDSON,

Defendants-Appellees
Cross Appellants,

2                    Opinion of the Court                    15-10958

CITY OF MONTGOMERY,
 et al.,

                                                    Defendants-Appellees.

                        _____

                 Appeals from the United States District Court
                    for the Middle District of Alabama
                 D.C. Docket No. 2:11-cv-01027-WKW-CSC

                        _____

Before JILL PRYOR, ED CARNES, and RIPPLE,[*] Circuit Judges.

PER CURIAM:

        Plaintiff Michael McGuire is required to register as a sex
offender under the Alabama Sex Offender Registration and
Community Notification Act ("ASORCNA" or the "Act"), Ala.
Code § 15-20A-1 *et seq.* For as long as he lives in Alabama, Mr.
McGuire must report in person each quarter to law enforcement.
ASORCNA also subjects individuals, like Mr. McGuire, who are
required to register as sex offenders ("registrants") to a variety of
other restrictions. A registrant generally cannot live or work within

---

[*] Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh
Circuit, sitting by designation.

2,000 feet of a school or childcare center.[1] A registrant who is homeless must report in person each week to provide law enforcement with updated information. And a registrant must notify law enforcement before traveling away from his residence for three or more consecutive days. In addition, when a registrant moves to a new home, the Act requires law enforcement to mail flyers to the registrant's neighbors informing them of the registrant's status as a sex offender.

In this lawsuit, Mr. McGuire sued the Alabama Attorney General and others, claiming that some provisions of ASORCNA impose retroactive punishment in violation of the Constitution's *Ex Post Facto* Clause. U.S. Const. art. I, § 10, cl. 1. After a bench trial, the district court entered judgment against Mr. McGuire, concluding that the retroactive application of these provisions did not amount to punishment. After careful review, we agree with the district court. Accordingly, we affirm in part and vacate and remand in part.[2]

In Part I, we discuss the factual background and procedural history of Mr. McGuire's challenge to ASORCNA. In Part II, we walk through ASORCNA's relevant provisions. In Part III, we identify the applicable standard of review. In Part IV, we address

---

[1] ASORCNA includes some exceptions to the employment and residency restrictions. *See infra* n.12.

[2] We vacate and remand in part because some of Mr. McGuire's challenges are now moot. *See infra* Section IV.

mootness. In Part V, we set forth the "intent-effects" framework used to determine whether the *Ex Post Facto* Clause prohibits a law's retroactive application. In Part VI, we apply this framework to analyze whether the *Ex Post Facto* Clause bars the retroactive application of the challenged provisions.

## I.     FACTUAL BACKGROUND

### A.     Factual History

In 1986, Michael McGuire was convicted in Colorado of: (1) first-degree sexual assault (rape) of his girlfriend "through the actual application of physical force and physical violence" using a knife "to cause submission"; (2) second-degree assault by causing and attempting to cause bodily injury "by means of a deadly weapon, to-wit: a knife and wine bottle"; and (3) menacing by placing another "in fear of imminent serious bodily injury." At the time of the crime, both Mr. McGuire and his girlfriend were 30 years old. Mr. McGuire served three years in prison and completed one year of parole. After his release from prison, Mr. McGuire spent much of the next 20 years working as a hair stylist and jazz musician in the Washington, D.C. area. During that time, he met a woman with whom he entered a common-law marriage in 2001.

In 2010, Mr. McGuire and his wife decided to move to Montgomery, Alabama, to live with and assist his elderly mother. Upon arriving in Montgomery, Mr. McGuire registered as a sex offender. He learned that he could not live with his mother because her home was too close to a childcare center.

Mr. McGuire looked for a compliant home. He asked local law enforcement about the suitability of dozens of homes for rent but was told that ASORCNA prevented him from living at any of those addresses. He and his wife stayed at a motel until their money ran out. The couple briefly stayed with Mr. McGuire's brother. But when his brother's minor children returned from a vacation, Mr. McGuire had to move out because ASORCNA prevented him from staying overnight with minors present. Unable to find housing, Mr. McGuire began living beneath an interstate overpass. He spent his days at the home where his wife lived and his nights underneath the interstate. Later he did find compliant housing. *See infra* n.20.

Upon returning to Montgomery, Mr. McGuire also faced difficulties finding a job. The district court found that ASORCNA's employment restrictions prevented him from accepting or applying for a number of jobs, including music-related engagements. The court noted that he occasionally performed as a musician at a venue in Montgomery that is more than 2,000 feet from a school or childcare center.

Before filing this lawsuit, Mr. McGuire began receiving Social Security disability benefit payments and has continued to receive them since then. He testified that he started receiving those disability benefits after he had confined himself to his house for four years due to agoraphobia and after he had what he describes as a "psychotic break" and "was diagnosed as schizophrenic." He also receives non-service-related benefit payments from the Veterans Administration for the same mental disabilities.

When Mr. McGuire was asked during the bench trial if he was "completely unable to work," he testified: "I can't really answer that question because I — I don't — I haven't been in a work environment for a while, so I don't know what my reactions would be, due to my schizophrenia. I don't know if I could — if I could function correctly on a job, but I'm willing to find out."[3]

---

[3] Federal regulations permit the payment of social security disability benefits only when a person's disabilities render him unable to perform "any substantial gainful activity." 20 C.F.R. § 404.1505(a); *see also id.* (explaining that a person is disabled when he has an impairment that meets or equals "the listing for a finding of disability"); 20 C.F.R., pt. 404, subpt. P, app. 1, pt. A2, §§ 12.03 (listing schizophrenia as a qualifying disability), 12.06 (listing agoraphobia as a qualifying disability). "The regulations define 'substantial gainful activity' as work that involves significant mental and physical activities and that is the kind of work that is usually done for pay or profit." *Johnson v. Sullivan*, 929 F.2d 596, 597 (11th Cir. 1991) (citing 20 C.F.R. § 404.1572). In determining whether work is substantial and gainful, a variety of factors are considered, such as "the time spent in the work; quality of the performance; whether the worker is self-employed; the need for special conditions or supervision; use of experience, skills and responsibilities; and whether the worker contributes substantially to the operation of the business." *Id.* (citing 20 C.F.R. § 404.1573); *see also* 20 C.F.R. § 404.1574(b) (an employed person earning more than a certain monthly income is generally considered to be engaging in substantial gainful activity). The Social Security Administration's and the Veteran Administration's determinations that Mr. McGuire was disabled because of his mental health conditions are not necessarily inconsistent with his performing either occasional work as a musician (as he, in fact, did) or limited part-time work (as he testified that he wanted to do). *See Johnson*, 929 F.2d at 597; U.S. Dep't of Veterans Affs., Individual Unemployability Fact Sheet (2018), https://www.benefits.va.gov/BENEFITS/factsheets/serviceconnected/IU.p

15-10958                Opinion of the Court                7

During the time that he was homeless, Mr. McGuire had to register in person each week. He was required to report in person each week to both the Montgomery County Sheriff's Office and the Montgomery City Police Department.[4]

B.     Procedural Background

Mr. McGuire filed this lawsuit naming the Attorney General of Alabama as defendant.[5] As relevant to this appeal, he challenged portions of ASORCNA as unconstitutional *ex post facto* laws.

After a bench trial, the district court entered detailed findings of fact and conclusions of law. In the findings of fact, the court described the difficulties that Mr. McGuire faced in trying to find housing and work outside of ASORCNA's exclusion zones. It also addressed the effect the residency and employment restrictions had on other registrants in Montgomery. The court found that these two restrictions made approximately 80 percent of the City of Montgomery's housing stock and 85 percent of its

---

df (stating that a veteran may receive disability benefits at a 100% rate when he is unable to "maintain[] substantial gainful employment").

[4] Since that time, ASORCNA has been amended, and homeless registrants are no longer subject to dual reporting requirements with the county and the city. *See* 2015 Ala. Laws 463; Ala. Code § 15-20A-12(b).

[5] Mr. McGuire also named as defendants the City of Montgomery, Montgomery's Chief of Police, Montgomery's Mayor, Montgomery County's Sheriff, and the Director of the Alabama Department of Public Safety. For convenience, in discussing the defendants we refer only to the Attorney General, who represents the positions of all the defendants.

jobs off limits to registrants. But many registrants were able to find housing and jobs in Montgomery nonetheless. Of the 430 registrants who lived or worked in the city, the court found only three were homeless.[6] And approximately 50 percent of these registrants had jobs. Although this meant that roughly half of the Montgomery registrants lacked jobs, the court noted that this number included some registrants who were not actively seeking employment.[7]

---

[6] The record also contains evidence about the number of homeless registrants in Montgomery County, which encompasses the City of Montgomery. Looking at those registrants who were registered with the County only, the district court found that there were about 70 additional registrants, none of whom was homeless. Considering the total number of registrants in both the city and the remainder of the county, only three of 500, or six-tenths of one percent of the registrants, were homeless.

[7] The court made no findings of fact about the effect of the residency and employment restrictions on registrants in communities outside of Montgomery County. The record contains limited evidence about that. One of Mr. McGuire's experts opined that the residency and employment restrictions likely would have a similar effect in Alabama's other largest cities—Birmingham, Hoover, Huntsville, Mobile, and Tuscaloosa. The expert explained that there was a direct correlation between a city's population density and the proportion of the city that was covered by exclusion zones. Because these other cities had similar population densities to Montgomery, he expected that the residency and employment restrictions would impact registrants in those communities similarly. Mr. McGuire offered no other evidence addressing the effect of the residency and employment restrictions on registrants living in any other part of Alabama, even though ASORCNA applies statewide to the 577 cities, towns, and Census Designated Places (CDPs) in Alabama and the 66 counties other than Montgomery. Instead, he

15-10958                Opinion of the Court                9

The court's conclusions of law addressed the merits of Mr. McGuire's *ex post facto* claims. The court explained that to prevail Mr. McGuire had to establish either that the legislature intended ASORCNA to impose punishment or that the challenged restrictions were sufficiently punitive in purpose or effect to overcome the legislature's nonpunitive intent. The court found that in enacting ASORCNA the Alabama legislature expressly intended to create a civil regulatory scheme, not to impose punishment. For most of the challenged restrictions, the district court concluded that Mr. McGuire failed to carry his burden of demonstrating that the restrictions were so punitive in purpose or effect that the legislature's nonpunitive intent was overridden. There were two exceptions: ASORCNA's dual reporting provisions, which required homeless registrants living in cities to report to both municipal and county law enforcement, and its travel permit requirement, which mandated that registrants living in cities obtain permission from both municipal and county law enforcement before traveling outside the area. The court determined that these two restrictions were so punitive in purpose or effect that the legislature's stated intent to create a civil regulation was negated. The district court declared the retroactive application of these two provisions unenforceable under the *Ex Post Facto* Clause.

---

presented evidence about only a single city where half of the registrants have jobs and more than 99 percent of them have housing.

Both Mr. McGuire and the Attorney General appealed parts of the district court's judgment. While this appeal was pending, the Alabama legislature amended ASORCNA. It removed the travel permit requirement and clarified that registrants simply needed to notify law enforcement before traveling. *See* 2017 Ala. Laws 414. It also modified the dual reporting requirements. Registrants who lived in cities no longer needed to report to *both* city and county law enforcement officers if they were homeless or planned to travel. *See* 2015 Ala. Laws 463.

In addition, the State changed how it implemented ASORCNA's requirement that a registrant carry a driver's license or state-issued identification card reflecting his status as a sex offender. At the time the district court ruled, the Alabama Law Enforcement Agency ("ALEA") implemented this requirement by issuing to registrants driver's licenses or identification cards with the label "CRIMINAL SEX OFFENDER" appearing in red letters on the face of the license or card. In a different lawsuit, a group of registrants challenged the labeling requirement under the First Amendment. The district court in that case declared that the identification requirement as implemented by ALEA was unconstitutional. *See Doe v. Marshall*, 367 F. Supp. 3d 1310, 1339 (M.D. Ala. 2019). After that ruling, ALEA changed the designation it used on licenses and identification cards by replacing the words

"CRIMINAL SEX OFFENDER" with a code. Since then, ALEA has issued to registrants new driver's licenses and identification cards.[8]

## II. ASORCNA'S REGULATION OF SEX OFFENDERS

We now discuss the relevant restrictions that ASORCNA in its current form imposes on sex offenders in Alabama.[9] These measures include: requiring in-person quarterly registration; providing direct notification to the public when a registrant lives nearby; barring registrants from living, working, or volunteering within 2,000 feet of schools or childcare centers; requiring homeless registrants[10] to report to law enforcement once a week; and compelling registrants to notify law enforcement before traveling.

---

[8] We take judicial notice of the district court's order and judgment in *Doe v. Marshall* as well as ALEA's change in policy. *See Cunningham v. Dist. Att'y's Off. for Escambia Cnty.*, 592 F.3d 1237, 1255 (11th Cir. 2010); *United States v. Rey*, 811 F.2d 1453, 1457 n.5 (11th Cir. 1987) (noting that we may take judicial notice of district courts' records).

[9] When a challenged statute has been amended, we "review the judgment of the district court in light of the law as it now stands." *Naturist Soc'y, Inc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992) (alteration adopted) (internal quotation marks omitted).

[10] ASORCNA defines "homeless" as "[t]he state of lacking a fixed residence." Ala. Code § 15-20A-4(7). Applying the statutory language, we use the term to refer to registrants who lack a fixed residence.

## A.    Registration and Direct Community Notification

ASORCNA requires adult sex offenders,[11] individuals who were age 18 or older when they committed a crime defined under Alabama law as a sex offense, to register with law enforcement. Ala. Code §§ 15-20A-4(1), 15-20A-10. Adult sex offenders are subject to ASORCNA for life.[12] *Id.* § 15-20A-3(b). The Act went into effect on July 1, 2011, 2011 Ala. Laws 640 § 52, but its provisions apply to persons convicted prior to this effective date. *See* Ala. Code § 15-20A-3(a) (explaining that ASORCNA applies to all "adult sex offender[s] . . . without regard to when his or her crime or

---

[11] Alabama imposes a separate set of restrictions on individuals who were not yet 18 at the time of their sex offense. *See* Ala. Code §§ 15-20A-4(11), 15-20A-26 to -34. Because Mr. McGuire committed his offense as an adult, we have no occasion to address the restrictions that Alabama imposes on juvenile sex offenders.

[12] Some classes of registrants may be excused from ASORCNA's restrictions. Under the so-called "Romeo and Juliet" exception, a state court may excuse an individual convicted of a sex offense from complying with ASORCNA if the court finds that the sex offense did not involve force and was a crime only because of the victim's age, the victim was at least 13 years old at the time of the offense, and the registrant was less than five years older than the victim. Ala. Code § 15-20A-24(b), (i). Alabama also allows registrants to petition for relief on a number of other grounds: relief from the employment restriction if the offender was not convicted of certain serious sex crimes and poses little risk of committing a future sex crime; relief from the residency restriction if the offender is seriously ill or disabled; and relief from a registration period of life for juvenile offenders. *See id.* §§ 15-20A-23, 15-20A-25, 15-20A-34.

crimes were committed or his or her duty to register arose"). Thus, it has retroactive application for those persons.

ASORCNA requires registrants to report in person to law enforcement on a quarterly basis. *Id.* § 15-20A-10(f). A registrant, like Mr. McGuire, who lives in a city has a dual reporting requirement, meaning he[13] must register each quarter both with his county sheriff and with his municipality's chief of police. *See id.* §§ 15-20A-4(12), 15-20A-10(f). Each time a registrant reports he must provide, among other things, information about where he is living, working, or attending school.[14] *Id.* § 15-20A-7(a). He also must notify law enforcement when his registration information changes. *Id.* § 15-20A-10(e)(1). A person who knowingly fails to register or otherwise knowingly violates the reporting requirement may be imprisoned for up to 10 years. *Id.* §§ 13A-5-6(a)(3), 15-20A-7(f), 15-20A-10(j).

The Alabama legislature imposed the reporting requirement to promote public safety. It explained that reporting creates "constant contact between sex offenders and law enforcement, providing law enforcement with priceless tools to aid them in their investigations including obtaining information for identifying,

---

[13] We refer to registrants using male pronouns for simplicity's sake. Of course, sex offenders of all genders must comply with ASORCNA.

[14] Unless they have already been collected and have not been altered, a registrant must provide (1) a photograph, (2) fingerprints, (3) a DNA sample, (4) a copy of his identification card, and (5) a copy of his passport or immigration documents. Ala. Code § 15-20A-7(b).

monitoring, and tracking sex offenders." *Id.* § 15-20A-2(1). It specified that the purpose of the registration requirement was "not to punish." *Id.* § 15-20A-2(5). It stated that the registration requirements were instead designed to "increas[e] public safety" by "mandating the release of certain information to the public." *See id.* § 15-20A-2(1). The legislature believed these registration requirements would "aid in public awareness and not only protect the community but serve to deter sex offenders from future crimes through frequent in-person registration." *Id.*

ASORCNA also requires law enforcement to notify community residents about the presence of a registrant in that community. The purpose of community notification is to "protect the community" by "inform[ing] the public of the presence of sex offenders in the community." *Id.* Again, the legislature specified that the purpose of community notification was "not to punish." *Id.* § 15-20A-2(5).

ASORCNA mandates two types of community notification: (1) indirectly through the internet on Alabama's public sex offender registry website and (2) directly by either mailing or hand delivering notices to a registrant's neighbors. *Id.* §§ 15-20A-8(a), 15-20A-21(a), (b).

First, law enforcement must maintain a public registry website with information about sex offenders. *Id.* § 15-20A-8(a). The statute requires that the website include certain information about each registrant in the state: his name, his home address, the address of his school or job, his picture, and a list of his qualifying

crimes. *Id.* And the website cannot include certain other information: the registrant's social security number; information about arrests that did not result in conviction; travel and immigration document numbers; the identity of victims; and the registrant's email addresses, instant message addresses, other online identifiers, or internet service providers. *Id.* The website must include "instructions on how to seek correction of information that a person contends is erroneous." *Id.* § 15-20A-8(g).

The website must include a warning that the information contained on it "should not be used to unlawfully injure, harass, or commit a crime against any person named in the registry or residing or working at any reported address and that any such action may result in civil or criminal penalties." *Id.* § 15-20A-8(h). It also must disclose that ALEA "did not consider or assess the individual's specific risk of reoffense or current dangerousness; that inclusion on the website is based solely on an individual's conviction record and state law; and that the Legislature's purpose in providing this data is to make the information more easily available and accessible, not to warn about any specific individual." *Id.*

Second, ASORCNA requires law enforcement to notify the nearby members of the community directly by mailing or hand delivering flyers about registrants. *Id.* § 15-20A-21(b). Self-identifying as a "Sex Offender Notification Flyer" issued by the Alabama Public Safety Community Information Center, the flyer contains the same information about a registrant that is included

on the public registry website. *Id.* Law enforcement must send the flyers to a registrant's neighbors when he first establishes a residence.[15] *Id.* § 15-20A-21(a), (b). Law enforcement may also use other notification methods such as posting a copy of the flyer in a prominent place, including it in a local newspaper, or posting it electronically. *Id.*

## B.    Residency Restrictions

ASORCNA's residency restrictions impose geographic restrictions on where registrants may live and bar them, between the hours of 10:30 p.m. and 6:00 a.m., from places where minors are present.[16] *See* Ala. Code §§ 15-20A-11(a), (d), 15-20A-4(14). The Alabama legislature intended these restrictions to "protect[] vulnerable populations, particularly children." *Id.* § 15-20A-2(5). A registrant who knowingly violates these restrictions may be punished by up to 10 years' imprisonment. *Id.* §§ 13A-5-6(a)(3), 15-20A-11(i).

---

[15] How widely law enforcement distributes the flyers depends on where the registrant lives. In Birmingham, Mobile, Huntsville, and Montgomery, law enforcement must distribute flyers to anyone who lives within 1,000 feet of the registrant's residence. Ala. Code § 15-20A-21(a)(1). In any other city with a population of 5,000 or more, the distance is 1,500 feet. *Id.* § 15-20A-21(a)(2). In any other area, the distance is 2,000 feet. *Id.* § 15-20A-21(a)(3). In addition, law enforcement must notify all schools and childcare facilities within three miles of the registrant's residence. *Id.* § 15-20A-21(a).

[16] ASORCNA also prohibits a registrant from living within 2,000 feet of a former victim or the victim's immediate family. Ala. Code § 15-20A-11(b). Mr. McGuire does not challenge this restriction, so we do not address it.

The geographic residency restriction prohibits registrants from "resid[ing]" in exclusion zones that extend 2,000 feet from the property line of each school and childcare center[17] in Alabama. *Id.* § 15-20A-11(a). A registrant need not stay overnight at a place to "reside" there. *Id.* § 15-20A-4(20). By definition, a registrant, even one who is homeless, resides anywhere he is "habitually or systematically present" and thus may reside at more than one place at a time. *Id.* Whether a registrant resides at a place depends on "the totality of the circumstances, including the amount of time the person spends at the place and the nature of the person's conduct at the place." *Id.* A registrant is considered to reside at a place if he spends (1) "more than four hours a day" there "on three or more consecutive days"; (2) "more than four hours a day" there "on 10 or more aggregate days during a calendar month"; or (3) "any amount of time" there "coupled with statements or actions that indicate an intent to live at the place or to remain at the place for the periods specified in this sentence." *Id.*

A registrant may live in an exclusion zone if, after establishing his residence, changes occur to the surrounding area that render the location noncompliant. *See id.* § 15-20A-11(c). For

---

[17] ASORCNA also bars a registrant from residing within 2,000 feet of a "resident camp facility." Ala. Code § 15-20A-11(a). "[A] resident camp facility includes any place, area, parcel, or tract of land which contains permanent or semi-permanent facilities for sleeping owned by a business, church, or nonprofit organization used primarily for educational, recreational, or religious purposes for minors[.]" *Id.* As we have stated, registrants can apply for relief from these residency restrictions. *See id.* § 15-20A-23.

example, if a registrant lives outside an exclusion zone and a new childcare center opens 500 feet away, the registrant generally may stay in his home. In addition, the Attorney General represents to us that the geographic residency restriction permits a registrant to continue living in a residence that he established before ASORCNA's effective date unless the registrant was released or convicted of a new offense after ASORCNA's enactment. The record supports that this is indeed how the law has been applied in practice.[18]

Beyond the geographic residency restriction, ASORCNA prohibits a registrant from "conduct[ing] an overnight visit with a minor" unless the registrant is the parent, grandparent, stepparent, sibling, or stepsibling of the minor. *Id.* § 15-20A-11(d). An overnight visit means "[a]ny presence between the hours of 10:30 p.m. and 6:00 a.m." *Id.* § 15-20A-4(14). Thus, during those hours, a registrant may not be present—for any period or any reason—where a minor

---

[18] There are two other exceptions to ASORCNA's geographic residency restrictions. First, before moving, a registrant may ask law enforcement to determine whether his intended new residence complies with ASORCNA. If law enforcement states in writing that the residence complies with ASORCNA, the registrant has not violated the law if it later turns out that the residence is within an exclusion zone. Ala. Code § 15-20A-11(g). Second, a registrant who is terminally ill or permanently immobile, has a debilitating medical condition requiring substantial care or supervision, or requires placement in a residential health care facility may be permitted to live inside an exclusion zone if a state court finds by clear and convincing evidence that he does not a pose a "substantial risk" of committing a future sex offense. *Id.* § 15-20A-23(a), (g).

is present, unless the registrant and the minor are related in one of the ways listed in § 15-20A-11(d).

## C.    Employment Restriction

ASORCNA limits where registrants may work or volunteer. The Act bars registrants from "accept[ing] or maintain[ing] employment or a volunteer position within 2,000 feet of the property on which a school or childcare facility is located." Ala. Code § 15-20A-13(b).[19] An exception permits a registrant to continue to work in an exclusion zone if, after he accepts employment, a new school or childcare center opens within 2,000 feet of his workplace. *See id.* § 15-20A-13(d). Additionally, a registrant may petition for relief from these employment restrictions if he was not convicted of certain sexual offenses and the court finds by clear and convincing evidence that he does not pose a substantial risk of committing another sexual offense. *Id.* § 15-20A-25(a), (f).

Like the residency restrictions, the Alabama legislature enacted the employment restriction to "further[] the primary governmental interest of protecting vulnerable populations,

---

[19] ASORCNA includes two other employment restrictions. One bars registrants from working or volunteering at schools, childcare centers, or businesses that primarily serve children. Ala. Code § 15-20A-13(a). The other bars registrants convicted of sex offenses involving children from working or volunteering within 500 feet of a playground, park, athletic field or facility, or other business or facility having a principal purpose related to children. *Id.* § 15-20A-13(c).

particularly children." *Id.* § 15-20A-2(5). A registrant who knowingly violates the employment restriction may be punished with up to 10 years' imprisonment. *Id.* §§ 13A-5-6(a)(3), 15-20A-13(g).

### D.    Homeless Registration Requirement

Registrants who are homeless must report to law enforcement far more frequently than registrants who have fixed residences. Homeless registrants must report 56 times a year because, in addition to the quarterly reports required of all registrants, they must make weekly reports to law enforcement. Ala. Code §§ 15-20A-10(f), 15-20A-12(b). Each week, a registrant who is homeless must provide a detailed description of where he "resided during the week" and a list of locations where he "plans to reside in the upcoming week with as much specificity as possible." *Id.* § 15-20A-12(d)(1).

The Alabama legislature required homeless sex offenders to report more often than other registrants because of "their mobility," finding that more frequent registration would protect the public. *Id.* § 15-20A-2(3). It found that "[a]s the number of homeless sex offenders increases, locating, tracking, and monitoring these offenders becomes more difficult." *Id.* The legislature expressly "declare[d] that its intent in imposing" this monitoring requirement was "not to punish." *Id.* § 15-20A-2(5). If a homeless registrant "knowingly violates" the registration requirements, he faces up to 10 years' imprisonment. *Id.* §§ 13A-5-6(a)(3), 15-20A-12(f).

### E.    Travel Notification Requirement

The Act requires registrants to notify law enforcement when traveling. Before leaving his county of residence for three or more consecutive days, a registrant must report to the county sheriff and "sign a travel notification document." Ala. Code § 15-20A-15(a). He must disclose his dates of travel, intended destination, and temporary lodging information. *Id.* § 15-20A-15(b). For domestic travel, a registrant must complete the document within three business days of beginning his trip. *Id.* §§ 15-20A-4(9), 15-20A-15(a). For international travel, he generally must complete the travel form 21 days prior to travel. *Id.* § 15-20-15(c). A registrant who knowingly violates the travel notification requirement faces up to 10 years' imprisonment. *Id.* §§ 13A-5-6(a)(3), 15-20A-15(h). The Alabama legislature imposed the travel notification requirement "to protect the public, and, most importantly, [to] promote child safety," not to punish registrants. *Id.* § 15-20A-2(5).

### III.    STANDARD OF REVIEW

Because Mr. McGuire appeals the district court's judgment entered after a bench trial, "we review the district court's conclusions of law *de novo* and the district court's factual findings for clear error." *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230 (11th Cir. 2009).

### IV.    MOOTNESS

Before turning to the merits of Mr. McGuire's claims, we must address whether any of Mr. McGuire's claims are moot. As

we noted above, while this appeal was pending, the Alabama legislature amended ASORCNA, and ALEA changed the way it implemented ASORCNA's identification-labeling requirement. *See supra* Section I-B.

The Constitution's "cases" and "controversies" requirement "subsists through all stages of federal judicial proceedings." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). "[I]t is not enough that a dispute was very much alive when [the] suit was filed." *Id.* "The parties must continue to have a personal stake in the outcome of the lawsuit." *Id.* at 478 (internal quotation marks omitted). Otherwise, we lack jurisdiction.

When a plaintiff challenges a law as unconstitutional and seeks only declaratory and injunctive relief, as Mr. McGuire does here, a subsequent change to the law or relevant policy can moot his claims. *See Crown Media, LLC v. Gwinnett Cnty.*, 380 F.3d 1317, 1324 (11th Cir. 2004); *Jews for Jesus, Inc. v. Hillsborough Cnty. Aviation Auth.*, 162 F.3d 627, 629 (11th Cir. 1998). In a case like this one involving multiple challenges, the entire case becomes moot only when the superseding statute removes all challenged features of the law. *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1342–43 (11th Cir. 2004). Challenges to individual features may become moot, however. *See Crown Media*, 380 F.3d at 1324.

Whether a defendant's voluntary cessation of conduct moots a claim is subject to a "stringent" test. *Coral Springs*, 371 F.3d at 1328 (internal quotation marks omitted). But we give

"governmental entities and officials . . . considerably more leeway" than private parties. *Id.* at 1328–29. The repeal or amendment of a statute or policy generally will moot a challenge unless there is a "substantial likelihood" that the challenged statute or policy will be reenacted or reinstated. *Id.* at 1329; *Jews for Jesus*, 162 F.3d at 629.

We agree with the parties that amendments to ASORCNA have not mooted Mr. McGuire's entire case. Some of the challenged provisions—the residency and employment restrictions, the homeless registration requirement, the travel notification requirement, and community notification—remain in effect. Accordingly, we address the merits of these claims based on ASORCNA as it currently exists. *See Naturist Soc'y, Inc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992).

But Mr. McGuire's objections to other requirements of ASORCNA are moot. These include challenges to the dual reporting requirements for city-dwelling registrants who are homeless or plan to travel. After the district court declared these requirements unconstitutional, ASORCNA was amended to remove those particular dual reporting requirements. Mr. McGuire does not contend that there is a substantial likelihood that those dual reporting provisions will be reenacted; thus we conclude that the claims challenging these requirements are moot.

Mr. McGuire's challenge to the identification-labeling requirement also is moot. Under ASORCNA, a registrant must carry a valid driver's license or other identification card issued by ALEA. Ala. Code § 15-20A-18(a). The identification must "bear a

designation that, at a minimum, enables law enforcement officers to identify the licensee as a sex offender." *Id.* § 15-20A-18(c). ALEA implemented the labeling requirement by placing the phrase "CRIMINAL SEX OFFENDER" in red, capital letters on the front of registrants' driver's licenses and identification cards. While this appeal was pending, however, ALEA changed its policy and no longer uses the "CRIMINAL SEX OFFENDER" label.

Given ALEA's policy change, Mr. McGuire's challenge is moot. ALEA ceased using the "CRIMINAL SEX OFFENDER" label after a district court in another case declared it unconstitutional, and the Attorney General did not appeal that decision. *See Doe*, 367 F. Supp. 3d at 1339. We presume that ALEA will not reinstate the policy. Therefore, Mr. McGuire's challenge to the identification-labeling requirement is moot. *See Coral Springs*, 371 F.3d at 1328–29.

To recap: the part of Mr. McGuire's appeal challenging the identification-labeling requirement is moot. Also moot is the Attorney General's cross-appeal challenging the district court's order striking the dual reporting requirements for homeless registrants and for travel notification. As a result, we will vacate the district court's judgment as to those requirements and remand with directions to dismiss as moot Mr. McGuire's claims challenging them. *See CIA v. Holy Spirit Ass'n for the Unification*

*of World Christianity*, 455 U.S. 997, 997 (1982); *Great W. Sugar Co. v. Nelson*, 442 U.S. 92, 93 (1979).[20]

---

[20] While this appeal was pending, the Attorney General sought to dismiss Mr. McGuire's challenge to the homeless registration requirement as moot because Mr. McGuire was no longer homeless. After oral argument, we remanded the case to the district court for the limited purpose of finding facts to determine whether this challenge was moot. Although Mr. McGuire had lived in a house for a time, the district court found that he was homeless again. Even when he was not homeless, the court found, there existed a reasonable expectation and demonstrated probability that he would return to being homeless in the future. The court also concluded that if Mr. McGuire ceased to be homeless in the future, his period of homelessness would be too short to litigate fully his challenge to the homeless registration provision.

It appears from Alabama's sex offender registry website that Mr. McGuire's current address is at a house in Montgomery, and he is no longer homeless. ALEA's Sex Offender Registry is available here: https://www.icrimewatch.net/results.php?AgencyID=54247&SubmitNameSearch=1&OfndrCity=montgomery&OfndrLast=&OfndrFirst=&level=&AllCity=&altaddr=home_addr&excludeIncarcerated=0&page=1 (last visited Sept. 29, 2022). We may take judicial notice of it. *See* Fed. R. Evid. 201(b), (d); *United States v. Howard*, 28 F.4th 180, 186 n.2 (11th Cir. 2022) ("Absent some reason for mistrust, courts have not hesitated to take judicial notice of agency records and reports.") (internal quotation marks omitted). Still, given the district court's findings, we conclude that his challenge to the homeless reporting requirement is not moot under the capable-of-repetition-yet-evading-review exception to the mootness doctrine. *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016).

## V.     THE LEGAL FRAMEWORK FOR EVALUATING *EX POST FACTO* CLAIMS

The Constitution forbids states from "pass[ing] any . . . ex post facto Law." U.S. Const. art. I, § 10, cl. 1. The *Ex Post Facto* Clause prohibits retroactive punishment; that is, it "forbids the application of any new punitive measure to a crime already consummated." *Kansas v. Hendricks*, 521 U.S. 346, 370 (1997) (internal quotation marks omitted). By prohibiting retroactive punishments, "the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver v. Graham*, 450 U.S. 24, 28–29 (1981). The framers of the Constitution intended provisions that serve as a check on a state's power, like the *Ex Post Facto* Clause, to protect disfavored groups:

> Whatever respect might have been felt for the state sovereignties, it is not to be disguised that the framers of the constitution viewed, with some apprehension, the violent acts which might grow out of the feelings of the moment; and that the people of the United States, in adopting that instrument, have manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed.

15-10958                Opinion of the Court                    27

*Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 137–38 (1810).[21] Because the *Ex Post Facto* Clause prohibits the retroactive application only of laws imposing punishment, a statutory scheme that is civil and regulatory in nature rather than criminal may apply retroactively without violating the Constitution. *See Collins v. Youngblood*, 497 U.S. 37, 43 (1990); *United States v. W.B.H.*, 664 F.3d 848, 852 (11th Cir. 2011).

To show entitlement to relief under the *Ex Post Facto* Clause, Mr. McGuire must establish that the challenged provisions in ASORCNA are criminal in nature. To determine whether a law is criminal in nature, we apply a two-part "intent-effects" test. *See Smith v. Doe*, 538 U.S. 84, 92 (2003). In the first step of the inquiry, we ask whether the legislature intended to impose punishment. *Id.* If the legislature intended to impose punishment, the inquiry ends, and the statutory scheme is punitive. *Id.* If the intent of the legislature was to create a civil and nonpunitive scheme, we proceed to the second step and ask whether the statutory scheme is "so punitive either in purpose or effect as to negate" the legislature's intent to deem it civil. *Id.* (internal quotation marks omitted). The Supreme Court has cautioned, "[b]ecause we

---

[21] *See also* The Federalist No. 44, at 249 (James Madison) (E.H. Scott ed., 1898) (describing the *Ex Post Facto* Clause as a "constitutional bulwark in favor of personal security and private rights"); The Federalist No. 84, at 468 (Alexander Hamilton) (E.H. Scott ed., 1898) ("[T]he subjecting of men to punishment for things which, when they were done, were breaches of no law . . . ha[s] been, in all ages, [a] favorite and most formidable instrument[] of tyranny.").

ordinarily defer to the legislature's stated intent, only *the clearest proof* will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* (emphasis added) (internal quotation marks and citation omitted). We discuss each step of the intent-effects analysis below.

## A.    The Intent Analysis

At the first step in our analysis, we ask "whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for [a civil or criminal] label." *Smith*, 538 U.S. at 93 (internal quotation marks omitted). For this inquiry into legislative intent, we "consider the statute's text and its structure." *Id.* at 92.

When the legislature states in a statute's text that the objective of the statutory scheme is to protect the public, it indicates an exercise of the State's power to protect the health and safety of its citizens and evidences an intent to enact a civil regulatory scheme. *See id.* at 93–94. In *Smith*, a group of sex offenders challenged Alaska's statute that required sex offenders to register with law enforcement and made much of the registration information public. *Id.* at 90–91. The plaintiffs claimed that retroactive application of the statute violated the *Ex Post Facto* Clause. *Id.* at 89. Under the Alaska law, individuals who had committed sex offenses were required to register with local law enforcement either quarterly for life or annually for fifteen years, depending on the number and the seriousness of their prior sex offense convictions. *Id.* at 90. The law also required the State to

15-10958                Opinion of the Court                29

maintain a publicly available registry of sex offenders, which it made available on a website. *Id.* at 90–91.

The Supreme Court concluded that the Alaska legislature intended the registration and community notification scheme to be civil. *Id.* at 93. The Court explained that the statute included a finding that sex offenders posed a high risk of reoffending and identified protecting the public as the primary governmental interest behind the law. *Id.* The Court accepted these statements on their face as sufficient to indicate that the legislature intended to create "a civil scheme designed to protect the public from harm." *Id.* (alteration adopted) (internal quotation marks omitted). It stated that the "imposition of restrictive measures on sex offenders adjudged to be dangerous is a legitimate nonpunitive governmental objective and has been historically so regarded." *Id.* (internal quotation marks omitted).

The Court rejected the registrants' argument that other features of the statute showed that the legislature intended it to be punitive. *See id.* at 93–94. The registrants argued that the codification of the registration provisions in the state's criminal procedure code showed a legislative intent to punish. *Id.* The Court acknowledged that the placement of the provisions in the criminal procedure code could be probative of the legislature's intent. *Id.* at 94. But it found this placement "not dispositive" because the "location and labels of a statutory provision do not by themselves transform a civil remedy into a criminal one." *Id.* The Court thus determined that "[t]he partial codification" of the registration

provisions in the criminal procedure code was insufficient "to support a conclusion that the legislative intent was punitive." *Id.* at 95.

## B.    The Purpose or Effect Analysis

In the second step of the inquiry, we "examine whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Smith*, 538 U.S. at 92 (alteration adopted) (internal quotation marks omitted). To determine whether a regulatory scheme is "so punitive" in purpose or effect when applied retroactively, we consider several factors that the Supreme Court originally adopted in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963), and later applied in the *ex post facto* context, *see Smith*, 538 U.S. at 97. *Mendoza-Martinez* directed us to consider:

> whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose.

*Smith*, 538 U.S. at 97.[22] These factors, which were "designed to apply in various constitutional contexts," are "neither exhaustive nor dispositive" and instead function as "useful guideposts." *Id.* (internal quotation marks omitted). Because courts "ordinarily defer to the legislature's stated intent, only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* at 92 (internal quotation marks and citation omitted). The Supreme Court has described this as a "heavy burden." *Hendricks*, 521 U.S. at 361. As our sister circuit has observed, "[t]his is a challenging standard for plaintiffs." *Hope v. Comm'r of Ind. Dep't of Corr.*, 9 F.4th 513, 530–31 (7th Cir. 2021) (en banc).

As we apply the listed factors, *Smith*, following *Mendoza-Martinez*, commands that we consider the challenged statutory scheme in its "necessary operation." *Smith*, 538 U.S. at 97. Courts generally use one of three distinct frameworks to review a constitutional challenge to a statutory provision, treating it as an

---

[22] *Mendoza-Martinez* identified two other factors, "whether the regulation comes into play only on a finding of scienter and whether the behavior to which it applies is already a crime." *Smith*, 538 U.S. at 105. In *Smith*, the Court gave these factors "little weight." *Id.* The Court explained that Alaska's scheme applied "only to past conduct, which was, and is, a crime." *Id.* Although the duty to register applied to individuals with prior convictions for sexual offenses only, the Court found it significant that the duty to register was based on prior crimes and "not predicated upon some present or repeated violation." *Id.* Following the Supreme Court's lead, we likewise give these factors little weight and find it unnecessary to address them further.

as-applied, a facial, or a quasi-facial challenge. After considering *Smith*, we conclude that "necessary operation" review does not fit neatly into any of these frameworks. Let us explain why.

In an as-applied challenge, a plaintiff seeks to vindicate only her own constitutional rights. *Jacobs v. Fla. Bar*, 50 F.3d 901, 906 (11th Cir. 1995). In evaluating an as-applied challenge, a court "addresses whether a statute is unconstitutional on the facts of a particular case" or in its application "to a particular party." *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009) (internal quotation marks omitted). By contrast, in a facial challenge, a plaintiff seeks "to invalidate a statute . . . itself" and to vindicate not only her own rights "but also those of others who may be adversely impacted by the statute." *DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1262 (11th Cir. 2007) (internal quotation marks omitted). A plaintiff who brings a facial challenge "bears the burden of proving that the law could never be applied in a constitutional manner." *Id.* To prevail, the plaintiff "must establish that no set of circumstances exists under which the [statute] could be valid." *Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013) (internal quotation marks omitted). In a "quasi-facial" challenge, the plaintiff contends that the law cannot be constitutionally applied to a defined subset of people the law covers, which includes herself. *Id.* To prevail in a quasi-facial challenge, he must satisfy the standard for a facial challenge to the extent that his claim "reach[es] beyond

[her] particular circumstances." *Doe v. Reed*, 561 U.S. 186, 194 (2010).

At first blush, Mr. McGuire appears to have brought an as-applied challenge because in his complaint he sought to vindicate his individual rights alone through a determination that the defendants had applied an *ex post facto* law to him. He did not ask the court to provide relief from ASORCNA's provisions to any other registrants. But an *ex post facto* challenge is different: we do not review it as we would an as-applied claim, where we focus exclusively on a law's application to a particular party. *See Seling v. Young*, 531 U.S. 250, 263–65 (2001).

In *Young*, the plaintiff challenged his confinement under a state law that authorized the civil commitment of sexually violent individuals who suffered "from a mental abnormality or personality disorder" that made them "likely to engage in predatory acts of sexual violence." *Id.* at 253. Shortly before Young completed his prison sentence for a sex crime, he was civilly committed. *Id.* at 255–56. After years of confinement, he filed a federal habeas petition claiming that his continued detention violated the *Ex Post Facto* and Double Jeopardy Clauses. *Id.* at 258. He alleged that the confinement statute was punitive as applied to him because of the length of time he had been confined and the conditions of his confinement, which were more restrictive than those placed on other civil commitment detainees. *Id.* at 259. The Ninth Circuit concluded that Young had adequately alleged the law

was punitive as applied to him and remanded for further proceedings. *Id.* at 260.

The Supreme Court rejected the Ninth Circuit's conclusion that Young "could raise an 'as-applied' challenge to the [statute] on . . . *ex post facto* grounds." *Id.* at 262. It explained that a court may not evaluate the "civil nature of an Act by reference to the effect that Act has on a single individual." *Id.* at 262; *see also Flemming v. Nestor*, 363 U.S. 603, 614 (1960) (noting that a civil law is "not punishment even though it may bear harshly upon one affected"). The Court warned that considering the effect of a law on only a single individual was "unworkable" because such an analysis would "never conclusively resolve whether a particular scheme is punitive." *Young*, 531 U.S. at 263. *Young* makes clear that an *ex post facto* claim cannot be treated as an as-applied challenge. *See id.* at 262–63; *Does v. Wasden*, 982 F.3d 784, 791 (9th Cir. 2020) (explaining that "ex post facto claims based on the punitive effect of purportedly civil statutes cannot be construed as 'as-applied' challenges").

Nor do *ex post facto* claims fit the frameworks used to review facial or quasi-facial challenges. In *Smith*, after concluding that the legislature intended to create a civil scheme, the Supreme Court considered whether Alaska's registration and community notification provisions were sufficiently punitive in effect to override the Alaska legislature's expressed intent. *See* 538 U.S at 97. In applying the *Mendoza-Martinez* factors, the Court did not use the words "facial" or "quasi-facial," and it did not inquire whether

15-10958                Opinion of the Court                35

there was at least one sex offender to whom the registration or notification provisions could retroactively be applied without violating the Constitution. *Id.* at 97–106. Instead, the Court's reasoning reflects that it considered the effects of the registration and notification provisions as they were generally felt by those who were subject to them. *See id.* at 100 (evaluating whether the challenged law imposed an affirmative disability or restraint, a *Mendoza-Martinez* factor, by looking for evidence that the statutory provisions "led to substantial occupational or housing disadvantages for former sex offenders that would not have otherwise occurred through the use of routine background checks by employers and landlords").

Regardless of how the framework is described, we can distill that a plaintiff has a "heavy burden," *Hendricks*, 521 U.S. at 361, when seeking to override a legislative expression of intent that a challenged provision is civil, and "only the clearest proof will suffice" to meet that burden, *Smith*, 538 U.S. at 92.[23] We

---

[23] Our decision in *Doe v. Miami-Dade County*, 974 F.3d 1333 (11th Cir. 2020), is not to the contrary. That case involved an *ex post facto* challenge to a county ordinance that barred sex offenders whose victims were children from living within 2,500 feet of a school. *Id.* at 1335. Before trial, the registrants "affirmatively disavowed" that they were seeking as-applied relief, telling the court they sought "only" facial relief. *Id.* at 1339 n.3, 1340. During trial, the registrants shifted gears and sought to amend their complaint to add an as-applied claim. *Id.* at 1336–37. The district court refused to allow the registrants to amend their complaint at that point. *Id.* at 1337. We affirmed, holding that the district court did not abuse its discretion in denying leave to amend,

understand that a plaintiff cannot carry his heavy burden by demonstrating the law's effects only as to him. At the same time, a plaintiff need not satisfy the standard for a facial or quasi-facial challenge, which would require a showing that the law could never be applied retroactively in a constitutional manner.

## VI.     ANALYSIS OF ASORCNA'S CHALLENGED PROVISIONS UNDER THE INTENT-EFFECTS TEST

At last, we apply the intent-effects test to determine whether ASORCNA is civil or punitive. Because we conclude that the Alabama legislature intended to enact a civil legislative scheme, we must assess whether Mr. McGuire has shown by "the clearest proof" that ASORCNA's challenged provisions are so punitive in purpose or effect as to override the Alabama legislature's stated intent to enact a civil regulatory scheme. *See Smith*, 538 U.S. at 92. We hold that he has failed to meet that heavy burden. *See Hendricks*, 521 U.S. at 361.

---

emphasizing that the county had no notice that the registrants intended to bring an as-applied claim and thus no opportunity to prepare to rebut that claim. *Id.* at 1339–41.

We questioned whether there was any actual distinction between an "as-applied" and "facial" *ex post facto* challenge. *Id.* at 1339 n.3. But given the registrants' litigation strategy and their express disavowal in the district court that they were bringing an as-applied challenge, we assumed, without deciding, that different frameworks were used to review "as-applied" and "facial" *ex post facto* challenges. *See id.*

A.    The Alabama Legislature Intended to Create a Civil, Nonpunitive Scheme

We begin by looking to the Alabama legislature's intent. In its legislative findings, the legislature explained that it had enacted the employment and residency restrictions along with the "monitoring and tracking" and community notification provisions to "further[] the primary governmental interest of protecting vulnerable populations, particularly children." Ala. Code § 15-20A-2(5). It also declared that "its intent in imposing certain registration, notification, monitoring, and tracking requirements on sex offenders [was] not to punish sex offenders but to protect the public and, most importantly, promote child safety." Id. We conclude that by expressly disavowing an intent to punish sex offenders and setting forth public-safety-related goals for the statutory scheme, the Alabama legislature intended the legislation to be nonpunitive. See Smith, 538 U.S. at 93 (holding that Alaska legislature intended to enact a civil scheme when statutory text identified protecting the public as the primary governmental interest).

Mr. McGuire argues that despite the Alabama legislature's expressed intent, before turning to the Mendoza-Martinez factors we should infer from the structure of ASORCNA that the legislature intended the scheme to be punitive because the statute is codified in Alabama's criminal procedure code and imposes criminal penalties on registrants who violate its provisions. He also argues that a canon of statutory construction indicates that the Alabama legislature had a punitive intent. But neither the structure

of the Act nor the application of the canons of construction reveals a punitive intent.

We are not persuaded by Mr. McGuire's codification argument. Even though a state legislature's decision to codify a statutory scheme in its criminal code may indicate a legislative intent to enact a punitive scheme, *Smith* tells us that when the legislature stated expressly in the statute that it intended the legislative scheme to have a nonpunitive objective, the location of the statutory provisions alone is insufficient to conclude otherwise. *Id.* at 94–95. We acknowledge that Mr. McGuire's codification argument is somewhat stronger here than the registrants' argument in *Smith* because all (not just part) of ASORCNA is codified in Alabama's criminal procedure code. But *Smith*'s reasoning leads us to reject this argument. *Id.* As the Court pointed out, "[i]nvoking the criminal process in aid of a statutory regime does not render the statutory scheme itself punitive." *Id.* at 96.

Mr. McGuire's related structural argument, that the legislature intended ASORCNA to be punitive because violations of it are criminal, is foreclosed by our decision in *W.B.H.* In *W.B.H.*, we considered whether Congress intended SORNA, the federal statute requiring in-person sex offender registration, to be civil or punitive. 664 F.3d at 854. We rejected the argument that Congress implicitly intended to create a punitive scheme by imposing a criminal penalty for violating the registration requirement because "civil regimes may impose criminal penalties for violations of their regulatory requirements." *Id.* Given

Congress's statement that the objective of the statute was to protect children from sex offenders, we held that Congress intended to enact a civil, nonpunitive scheme despite making failure to register a crime. *Id.* at 854–55. *W.B.H.* dictates our conclusion that the Alabama legislature intended ASORCNA to be civil even though the statute imposes criminal penalties on registrants who fail to comply with its provisions.

Mr. McGuire's next argument is that we should conclude the Alabama legislature intended the residency and employment restrictions to be punitive based on the *expressio unius est exclusio alterius* canon of construction. The legislature specified that the registration, notification, monitoring, and tracking requirements were not intended to punish sex offenders without mentioning the residency and employment restrictions in that particular sentence, though they are addressed in the same paragraph. Ala. Code § 15-20A-2(5).[24] Mr. McGuire argues that under the *expressio unius*

---

[24] In its entirety, the paragraph states:

> Sex offenders, due to the nature of their offenses, have a reduced expectation of privacy. In balancing the sex offender's rights, and the interest of public safety, the Legislature finds that releasing certain information to the public furthers the primary governmental interest of protecting vulnerable populations, particularly children. Employment and residence restrictions, together with monitoring and tracking, also further that interest. The Legislature declares that its intent in imposing certain registration, notification, monitoring, and tracking requirements on sex offenders is not to punish sex

40                    Opinion of the Court                    15-10958

canon, we must infer that the legislature intended the omitted residency and employment restrictions to be punitive. We cannot agree.

Under this canon of construction, "when a legislature has enumerated a list or series of related items, the legislature intended to exclude similar items not specifically included in the list." *Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1193 (11th Cir. 2011). But the canon "can be overcome by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) (internal quotation marks omitted).

We reject Mr. McGuire's argument because the *expressio unius* canon is overcome here. In context, ASORCNA's exclusion of the residency and employment restrictions from the list of provisions that the legislature stated in one sentence were intended "not to punish" does not signal that it intended for them to be punitive. Ala. Code § 15-20A-2(5). It does not because in the immediately preceding sentence of the very same paragraph, the legislature stated that the residency and employment restrictions "also further" the interest in "protecting vulnerable populations, particularly children." *Id.* That indicates a civil, nonpunitive intent. *See Smith*, 538 U.S. at 93–94.

---

offenders but to protect the public and, most importantly, promote child safety.

Ala. Code § 15-20A-2(5).

**B.     Mr. McGuire Failed to Establish by the Clearest Proof that the Challenged Restrictions Are Sufficiently Punitive to Override the Legislature's Intent**

Having determined that the Alabama legislature intended ASORCNA to be civil and regulatory rather than punitive, we move to the second step of the *ex post facto* analysis: whether the challenged restrictions are "so punitive either in purpose or effect as to negate [Alabama's] intention to deem" the restrictions civil. *Smith*, 538 U.S. at 92 (internal quotation marks omitted). We consider each restriction in turn.[25]

---

[25] For ease of analysis, we consider the residency and employment provisions of ASORCNA together because even in combination, we conclude that they do not violate the *Ex Post Facto* Clause. We recognize, however, that if our conclusion were different, we would be bound to preserve as much of the Act as possible. *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) ("A court should refrain from invalidating more of the statute than is necessary. Whenever an act of [the legislature] contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid." (alterations adopted) (internal quotation marks omitted)). Every statute codified as part of the 1975 Code of Alabama, including ASORCNA, is subject to a strong severability clause. *See* Ala. Code § 1-1-16 ("If any provision of this Code or any amendment hereto, or any other statute, or the application thereof to any person, thing or circumstances, is held invalid by a court of competent jurisdiction, such invalidity shall not affect the provisions or application of this Code or such amendment or statute that can be given effect without the invalid provisions or application, and to this end, the provisions of this Code and such amendments and statutes are declared to be severable.").

### 1. Mr. McGuire Failed to Carry His Heavy Burden to Prove that the Residency and Employment Restrictions Are Sufficiently Punitive in Purpose or Effect

We first consider whether Mr. McGuire has established by the clearest proof that ASORCNA's residency and employment restrictions are sufficiently punitive in purpose or effect to override the legislative intent that they be civil. After careful consideration, we conclude that Mr. McGuire failed to carry the heavy burden required to override the legislature's stated nonpunitive intent.

### a. Resemblance to a Traditional Punishment

Mr. McGuire argues that the residency and employment restrictions, which jointly prohibit registrants from residing, working, or volunteering within a 2,000-foot radius of any school or childcare facility in Alabama, sufficiently resemble the traditional punishment of banishment. We are not convinced.

With the first factor, we consider whether the statutory scheme imposes what has been regarded in our history and tradition as punishment. This type of "historical survey can be useful because a State that decides to punish an individual is likely to select a means deemed punitive in our tradition, so that the public will recognize it as such." *Smith*, 538 U.S. at 97. But a statutory restriction need not be identical to a traditional punishment for this factor to be satisfied. The relevant question is whether the challenged provision sufficiently "resemble[s]" or is "analogous" to a historical and traditional form of punishment. *Id.*

at 97, 99; *see also W.B.H.*, 664 F.3d at 855 (explaining that we consider whether a restriction "resemble[s] historical and traditional forms of punishment"). The amount of resemblance required must be something more than "initial resemblance." *See Smith*, 538 U.S. at 98 ("Any initial resemblance to early punishments is, however, misleading. Punishments such as whipping, pillory, and branding inflicted physical pain and staged a direct confrontation between the offender and the public. Even punishments that lacked the corporal component, such as public shaming, humiliation, and banishment, involved more than the dissemination of information.").

The question we face here is whether the residency and employment restrictions bear a sufficient resemblance to the traditional punishment of banishment. Banishment dates back more than 4,000 years. *See* Wm. Garth Snider, *Banishment: The History of Its Use and a Proposal for Its Abolition Under the First Amendment*, 24 New. Eng. J. on Crim. & Civ. Confinement 455, 459 (1998). It is a form of punishment contained in the Code of Hammurabi, Mosaic law, the Old Testament Book of Esther, the Laws of Manu, and the T'ang Code. *Id.* at 459–60. It became most familiar to Americans in the early 1700s, when the United Kingdom passed the Transportation Act of 1718 and banished around 50,000 of its criminals to America. *Id.* at 461–62.

As its history reflects, banishment punishes by "expell[ing]" a person "from the community." *Smith*, 538 U.S. at 98. Sometimes it has been referred to as "exile, deportation, [or] relegation."

*United States v. Ju Toy*, 198 U.S. 253, 269 (1905) (Brewer, J., dissenting). Whatever the name, it was considered a punishment of the "severest sort." *Id.* at 273. Those who suffered it could "neither return to their original community nor, reputation tarnished, be admitted easily into a new one." *Smith*, 538 U.S. at 98. Banished offenders were rendered "absolutely dead in law" and "entirely cut off from society." 1 William Blackstone, *Commentaries on the Laws of England* \*132.

Although the residency and employment restrictions limit where registrants may live or work, we hold that the restrictions do not sufficiently resemble the traditional punishment of banishment to be considered punitive. Registrants are not totally prohibited from entering the exclusion zones that ASORCNA creates. It is true that they may not reside, work, or volunteer in the exclusion zones. But they remain able to enter exclusion zones for other purposes. For example, they may go into exclusion zones to see health care providers, visit friends or family, eat meals, shop, or worship. Indeed, a registrant may visit the same location in an exclusion zone every day, so long as he does not spend more than four hours a day in the place on three or more consecutive days or on ten or more aggregate days during a calendar month and does not indicate an intention to live there. *See* Ala. Code § 15-20A-4(20). In addition, the Attorney General concedes that registrants are permitted to work in jobs that require them to perform some tasks inside exclusion zones. For example, the Attorney General says a registrant working as a delivery person may drop off

packages at locations inside exclusion zones and a registrant working as a landscaper may tend to yards inside exclusion zones.

Mr. McGuire nevertheless argues that the residency and employment restrictions resemble banishment because they "effectively" bar registrants from the City of Montgomery. Appellant's Br. at 17. We assume for purposes of this appeal that restrictions prohibiting registrants from entering exclusion zones for some, but not all, purposes could in some circumstances resemble banishment. But Mr. McGuire has not shown that ASORCNA's residency and employment restrictions operate to effectively bar registrants from Montgomery.

In arguing that the residency and employment restrictions effectively cast registrants out of Montgomery, Mr. McGuire points to two categories of evidence. First, he points to evidence about the difficulties he faced in finding a home or job outside the exclusion zones. Second, he points to evidence supporting the district court's finding that the residency and employment restrictions excluded registrants from more than 80 percent of the housing stock and jobs in Montgomery.[26]

---

[26] Mr. McGuire's argument assumes that he can carry his heavy burden to show that the residency and employment restrictions in their necessary operation resemble banishment through evidence addressing the effect of these restrictions on registrants in his community of Montgomery, without establishing that the statewide restrictions also have a similar effect in other parts of Alabama. We do not decide whether this assumption is correct

Mr. McGuire's evidence about his individual circumstances and the particular difficulties that he faced in finding compliant housing and work outside of the exclusion zones does not establish that the residency and employment restrictions resemble banishment. In relying on this evidence, Mr. McGuire effectively treats his *ex post facto* claim as an as-applied challenge in which he can establish a constitutional violation through evidence about the restrictions' application solely to him. But the Supreme Court's decision in *Young* forecloses the as-applied avenue. The Court made clear that we cannot evaluate whether a restriction is punitive "by reference to the effect that [it] has on a single individual." *Young*, 531 U.S. at 262.

Setting aside evidence of the restrictions' effects on Mr. McGuire personally, we consider his other evidence. He argues that the residency and employment restrictions effectively cast registrants out of Montgomery because they make approximately 80 percent of the housing stock and 85 percent of the jobs off limits to registrants.

The district court found that the residency and employment restrictions seriously limit registrants' housing and employment options in Montgomery, and these findings are not clearly

---

because, even assuming Mr. McGuire could carry his burden by introducing evidence only as to Montgomery, he failed to establish by the clearest proof that the residency and employment restrictions exclude registrants from Montgomery in a way that resembles banishment.

erroneous given the evidence in the record. But even so, we cannot say that Mr. McGuire established that the restrictions are so severe that they resemble banishment and effectively cast registrants out of the community. The evidence of record demonstrates that registrants have remained able to find housing and jobs in Montgomery. As the district court found, of the approximately 430 registrants in Montgomery, only three were homeless. This means that more than 99 percent of the individuals required to register in Montgomery were able to find housing. Approximately half of the registrants in Montgomery were able to find jobs. And of the half who were not working, the district court explained that some were not actively seeking work (perhaps because they were retired, attending school, or physically unable to work). The question is not whether there are houses or jobs off-limits to registrants because of the exclusion zones; the question is whether there are houses or jobs sufficiently open to them notwithstanding the exclusion zones. Obviously there are, and Mr. McGuire does not point to any evidence that the available houses or jobs are so undesirable that they should not be counted.

Nothing in ASORCNA bars registrants from going into exclusion zones for any purpose besides employment or establishing a residence, as defined in the statute. And ASORCNA does not restrict registrants from going into non-exclusion zones as much as they like, as long as they aren't conducting an "overnight visit" with a minor. *See* Ala. Code § 15-20A-4(14); *id.* § 15-20A-11(d).

ASORCNA does not banish registrants from the jurisdiction, whether a city or a state, or "expel[] [them] from the community." *Smith*, 538 U.S. at 98. It does not cut them off from interacting with other adults, or even with minors during the daytime. As the district court explained, registrants are "not barred from frequenting *any* part of the city during the day." *McGuire v. Strange*, 83 F. Supp. 3d 1231, 1253 (M.D. Ala. 2019) (emphasis added). And "any part" includes all of the exclusion zones.

Registrants may enter the exclusion zones for any purpose except residency or employment there, so long as they do not exceed the specified frequency and duration limits. Mr. McGuire's evidence about the restrictions' effects on housing and employment prospects for registrants does not establish that registrants are effectively cast out of Montgomery in a way that resembles banishment.[27]

---

[27] We note the Sixth Circuit's decision holding that a Michigan law establishing exclusion zones for sex offenders resembled banishment. *See Doe v. Snyder*, 834 F.3d 696, 701–02 (6th Cir. 2016). But the Michigan law barred registrants from engaging in a broader range of conduct in the exclusion zones. It prohibited registrants not only from living or working in exclusion zones but also from "loitering" in these areas. *Id.* at 698 (internal quotation marks omitted). It also effectively barred registrants from working any job that required "traveling from jobsite to jobsite" because "work will surely take place within a school zone at some point." *Id.* at 702. In contrast, ASORCNA imposes no bar on loitering, and registrants may hold jobs that occasionally require them to perform tasks inside, or to cross through, an exclusion zone. Given the differences, even after considering the Sixth Circuit's analysis, we

### b.  Affirmative Disability or Restraint

We next ask whether the residency and employment restrictions impose an affirmative disability or restraint. We accept, and the Attorney General seems to concede, that these restrictions impose some affirmative disability or restraint by limiting where registrants may live or work.

In considering whether the legislative scheme imposes an affirmative disability or restraint, we ask "how the effects of the [law] are felt by those subject to it." *Smith*, 538 U.S. at 99–100. If the restraint imposed is only "minor and indirect, its effects are unlikely to be punitive." *Id.*

In *Smith*, the Court concluded that Alaska's registration and notification scheme imposed no affirmative disability or restraint. The Court began by noting that because the scheme imposed no physical restraint, it did not "resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint." *Id.* The Court further concluded that the scheme did not impose any other type of affirmative disability or restraint. It explained that Alaska's scheme "[did] not restrain activities sex offenders may pursue" and left them "free to change jobs or

_____

are not persuaded that Alabama's residency and employment restrictions resemble banishment. *Cf. Shaw v. Patton*, 823 F.3d 556, 567–68, 577 (10th Cir. 2016) (holding that a 2,000-foot residency restriction did not cause the plaintiff to be "expelled from a community" although he was restricted from living in some areas, and the statute also contained a 500-foot loitering provision).

residences," meaning they could "live and work as other citizens." *Id.* at 100–01. The Court determined that the record contained no evidence that the Alaska Act had "led to substantial occupational or housing disadvantages for former sex offenders that would not have otherwise occurred through the use of routine background checks by employers and landlords." *Id.* at 100.

In this case, the district court found that ASORCNA's residency and employment restrictions imposed "direct . . . restraints and disabilities." *McGuire*, 83 F. Supp. 3d at 1258. But the imposition of an affirmative disability or restraint "does not inexorably lead to the conclusion that the government has imposed punishment." *Hendricks*, 521 U.S. at 363 (internal quotation marks omitted). Rather, we must consider "the degree of the restraint involved in light of the legislature's countervailing nonpunitive purpose," meaning we also must consider "whether the law is rationally connected to a nonpunitive purpose, and whether it is excessive in relation to that purpose." *Doe v. Miller*, 405 F.3d 700, 721 (8th Cir. 2005). As we explained, Mr. McGuire presented evidence that the residency and employment restrictions impose some housing and occupational disadvantages on registrants in Montgomery by limiting where they can live and work. All residency and employment restrictions do. But as we explain in more detail below, ASORCNA's residency and employment restrictions are rationally connected to a nonpunitive purpose and are not excessive in relation to that purpose. After weighing the degree of disability imposed and the legislature's nonpunitive

purpose, we conclude that the affirmative disability or restraint imposed by the residency and employment restrictions is not sufficiently punitive to override the legislature's expressed intent to create a civil, nonpunitive scheme. *See Shaw v. Patton*, 823 F.3d 556, 570 (10th Cir. 2016) (concluding that Oklahoma's 2,000-foot residency restriction did "not amount to a disability or restraint that has a punitive effect").

### c. Traditional Goals of Punishment

Mr. McGuire argues that the residency and employment restrictions are punitive because they further two traditional goals of punishment: deterrence and retribution. But the restrictions do not have such a strong deterrent or retributive effect that it renders them punitive.

Whether the statutory scheme "promotes the traditional aims of punishment" is the third factor the Supreme Court considered in *Smith*. 538 U.S. at 97. The traditional aims, or theories, of punishment are deterrence and retribution. *See Hudson v. United States*, 522 U.S. 93, 101 (1997).

The deterrence theory of punishment refers to "the prevention of criminal behavior by fear of punishment." *Deterrence, Black's Law Dictionary* (10th ed. 2014). The Supreme Court's decision in *Smith* tells us little about how to determine whether a statutory scheme furthers deterrence. Alaska conceded that its registration and notification scheme promoted deterrence,

so the Court did not need to decide the question. *Smith*, 538 U.S. at 102.

The residency and employment restrictions promote the goal of deterrence, Mr. McGuire contends, by imposing an additional penalty for past sex offenses and thus preventing future crimes. We accept that the restrictions in some sense function as a deterrent by preventing future crime. As the statutory text reflects, the Alabama legislature intended the restrictions to protect children by preventing future sex offenses, suggesting that the legislature understood the restrictions would prevent, or deter, future crimes. *See* Ala. Code § 15-20A-2(1), (5).

Even though the residency and employment restrictions have some deterrent effect, we cannot say that they are so punitive that they override the legislature's intent to enact a civil scheme. The registrants in *Smith* pointed to the concession that Alaska's scheme promoted deterrence to argue that the law was punitive. But the Court rejected the argument as "prov[ing] too much." *Smith*, 538 U.S. at 102. Because "[a]ny number of governmental programs might deter crime without imposing punishment," the Court cautioned, "[t]o hold that the mere presence of a deterrent purpose renders such sanctions criminal would severely undermine the Government's ability to engage in effective regulation." *Id.* (alteration adopted) (internal quotation marks omitted).

The retribution theory of punishment reflects that it is "fitting and just that one who has caused harm to others should

himself suffer for it." Wayne R. LaFave, *Substantive Criminal Law* § 1.5(a)(6) (2d ed. 2003). "A statute is retributive if it is intended to express condemnation for a crime and to restore moral balance." *Shaw*, 823 F.3d at 571.

Mr. McGuire argues that the residency and employment restrictions advance the goal of retribution because the restrictions "are not tailored to the crime, the offender, the victim, the length of time since the crime, or any other metric," and thus they must be "a blunt and indiscriminate tool designed simply to punish registrants for past offenses." Appellant's Suppl. Br. at 38.

The residency and employment restrictions in ASORCNA may have a retributive effect, to some extent. The restrictions are imposed on registrants solely because of their earlier criminal convictions, prompting one court to infer that they reflect societal condemnation for a registrant's underlying crime. *See Shaw*, 823 F.3d at 571. But we find any expression of condemnation insufficiently clear or strong to negate the legislature's stated nonpunitive intent.

The fact that the statutory scheme may have had a retributive effect did not convince the Supreme Court in *Smith* that the scheme was so punitive in effect that it overrode the legislature's civil intent. 538 U.S. at 102. Under Alaska's registration scheme, the scope of a registrant's reporting requirement depended solely on the nature of his underlying crime or crimes. A person who committed a single, non-aggravated sex crime was required to register annually as a sex offender for 15 years. *Id.* at 90.

But a person who committed an aggravated sex offense, or two or more sex offenses, was required to register quarterly as a sex offender for life. *Id.* Because the duration of the duty to register depended on the nature of the sex offender's underlying crime rather than an individualized assessment of the risk he posed, the Ninth Circuit held that Alaska's registration requirement had a retributive purpose and was punitive in effect. *Id.* at 102.

The Supreme Court disagreed. It acknowledged that the Alaska statute differentiated among registrants based on the nature of the underlying criminal conduct—whether the offense was aggravated or repeated. *Id.* Still, the Court determined that the Ninth Circuit "was incorrect to conclude that the Act's registration obligations were retributive." *Id.* The Court explained that the registration requirement was "reasonably related to the danger of recidivism" in a way that was "consistent with the regulatory objective." *Id.* The Court also recognized: "The legislature's findings are consistent with grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class." *Id.* at 103. "The risk of recidivism posed by sex offenders is frightening and high." *Id.* (internal quotation marks omitted).

Although Alabama imposes the restrictions on registrants as a class without making individualized risk assessments, following *Smith*, we conclude that "[t]he *Ex Post Facto* Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences." *Id.* As we explain below, the restrictions

have a rational connection to a nonpunitive purpose and are not excessive.

### d. Rational Connection to a Nonpunitive Purpose

We next consider whether the residency and employment restrictions lack a rational relationship to a nonpunitive purpose. This inquiry is a most—if not *the* most—significant factor. *Smith*, 538 U.S. at 102.[28] In *Smith*, the Supreme Court held that this factor was satisfied when the purpose of the sex offender registration and notification legislation was to protect public safety by "alerting the public to the risk of sex offenders in their community." *Id.* at 102–03 (alteration adopted) (internal quotation marks omitted). We conclude that ASORCNA's residency and employment restrictions are likewise consistent with the nonpunitive purpose of promoting public safety.

The Attorney General argues that the residency and employment restrictions protect public safety because (1) sex offenders are likely to commit future offenses against children, and (2) the restrictions prevent future sex offenses against children by keeping registrants away from children. Mr. McGuire disagrees and says that the record evidence established that sex offenders have lower recidivism rates than the Attorney General suggests and that creating zones of exclusion does not actually protect

---

[28] We have described this factor "as *the* most 'significant' one in the *ex post facto* analysis." *Waldman v. Conway*, 871 F.3d 1283, 1294 (11th Cir. 2017) (emphasis added) (quoting *Smith*, 538 U.S. at 102).

children from future sex crimes. Importantly, though, with respect to this factor, the question is not whether the weight of the evidence shows that sex offenders are likely to recidivate or whether residency and employment restrictions in fact prevent future sex crimes. Instead, our inquiry is limited to whether it would be rational for a legislature to draw these conclusions. Given the narrow scope of our inquiry, we find a rational connection to a nonpunitive purpose here.

To begin, we conclude it was rational for the Alabama legislature to conclude that sex offenders pose a risk of committing future sex crimes against children. The Attorney General points to research in the record showing that sex offenders generally pose a greater threat of committing future sex crimes than the general population does, including research showing that sex offenders are four times more likely than non-sex offenders to be rearrested for a sex crime after release from prison.

Mr. McGuire responds that social science research in the record indicates that sex offenders may have lower recidivism rates than previously thought. But we need not resolve this dispute about the relative rate of recidivism for sex offenders. Again, to apply this factor, we simply ask whether it was *rational* for the Alabama legislature to conclude that sex offenders are more likely than the general population to commit future sex crimes. And based on evidence in this record, we cannot say that it was irrational.

Mr. McGuire also argues that the residency and employment restrictions lack a rational relationship to the State's legitimate purpose because, he asserts, registrants whose previous crimes involved adult victims are unlikely to commit future sex offenses against children. Record evidence reflects, however, that sex offenders are not specialists with respect to the gender and age of their victims. This is not to say that sex offenders whose prior offenses involved adults pose the same risk of committing future sex offenses against minors as do sex offenders whose prior offenses involved minors. But, again, because there is some evidence that adult sex offenders pose a greater threat to children than does the general population, we cannot deem irrational the Alabama legislature's conclusion that children are protected by restraints on sex offenders whose previous victims were adults.

Next, we consider whether residency and employment restrictions are a reasonable way to protect children from future sex offenses. The assumption underlying these restrictions is that limiting registrants' access to public areas that children frequent will reduce crime. The Attorney General introduced into evidence a study showing that removing registrants from the areas near schools and childcare centers reduced crime. Mr. McGuire points to other evidence showing that *most* sex crimes against children are committed not by a stranger who happens to encounter a child in public but instead by someone the child knows—which calls into question whether broad exclusion zones actually protect children from sex crimes. Mr. McGuire's expert testified, and other evidence

in the record supports, that there is no significant relationship between a person reoffending and his proximity to schools or day care.

The Attorney General presented evidence showing that residency and employment restrictions reduce the risk of future crimes, and we afford great deference to the Alabama legislature's statement in ASORCNA that it intended for the Act to protect public safety, not to impose punishment. *See* Ala. Code §§ 15-20A-2(1) ("[T]he number of sex offenders continues to rise. The increasing numbers coupled with the danger of recidivism place society at risk."); 15-20A-2(3) ("Homeless sex offenders are a group of sex offenders who need to be monitored more frequently for the protection of the public. Homeless sex offenders present a growing concern for law enforcement due to their mobility."); 15-20A-2(5) (noting that residency and employment restrictions "further[] the primary governmental interest of protecting vulnerable populations, particularly children"). Mr. McGuire failed to establish by the clearest proof that the residency and employment restrictions lack a rational connection to the nonpunitive purpose of protecting the public. This factor weighs against finding that these restrictions are punitive in effect.

### e. Excessiveness

The final factor requires us to consider whether Mr. McGuire has met his burden to show that ASORCNA's residency and employment restrictions are excessive. A restriction is not excessive so long as the State has chosen a reasonable means to

achieve its nonpunitive objective. *See Smith*, 538 U.S. at 105. In this inquiry, we do not ask whether the legislature made the "best choice possible" to achieve its nonpunitive aim. *Id.* As the Supreme Court has cautioned, "[a] statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *Id.* at 103.

On appeal, Mr. McGuire argues that the residency and employment restrictions are excessive for three reasons: (1) they apply to all registrants for life; (2) other state laws are less severe; and (3) the restrictions caused Mr. McGuire to be homeless and unable to find a job. After considering these arguments, we conclude that Mr. McGuire has not carried his burden.

First, Mr. McGuire argues that the residency and employment restrictions are excessive because they apply to registrants for life. We understand Mr. McGuire to be saying that the restrictions are excessive because they apply to all registrants as a class without any individualized risk assessment.

The Supreme Court rejected a similar argument in *Smith*. The registrants argued that Alaska's registration scheme was excessive because it applied to all convicted sex offenders without regard to their future dangerousness. *Id.* But the Court rejected this argument, explaining that the *Ex Post Facto* Clause permits a State to make "reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences" and to "legislate with respect to convicted sex offenders as a class,

rather than require individual determination of their dangerousness." *Id.* at 104.

We thus cannot say that the residency and employment restrictions are excessive simply because Alabama applied them to registrants as a class without making any individual determinations about dangerousness. Importantly, as we explained above, the legislature could reasonably try to advance its goal of protecting the public by creating a categorical rule that subjects registrants to residency and employment restrictions. *See* Part VI-B-1-c & d; *Shaw*, 823 F.3d at 576 (holding that Oklahoma's residency restriction was not excessive even though it created "a categorical rule for sex offenders"); *Miller*, 405 F.3d at 722 (rejecting argument that Iowa's residency restriction was excessive because it applied to registrants as a class).

Second, Mr. McGuire argues that the residency and employment restrictions are excessive when combined because they are more severe than the restrictions imposed by other states.[29] This argument rests on the premise that a state's restriction may be shown to be excessive merely because of its severity in

---

[29] It appears that the other states' laws that impose both residency and employment restrictions establish smaller exclusion zones, which extend between 300 and 1,000 feet around schools and daycare centers. *See, e.g.*, O.C.G.A. § 42-1-15 (geographic residency and employment restrictions with 1,000-foot exclusion zones); Mont. Code Ann. § 45-5-513 (geographic residency and employment restrictions for "high-risk sexual offender[s]" with 300-foot exclusion zones); Tenn. Code Ann. § 40-39-211 (geographic residency and employment restrictions with 1,000-foot exclusion zones).

relation to other states' restrictions or because other states have chosen less restrictive means to achieve their regulatory purpose. But Mr. McGuire cites no authority holding that such a showing satisfies a plaintiff's burden. And we are not persuaded by this argument, which seems in tension with the role of the states as "laboratories for experimentation" that may "devise various solutions where the best solution is far from clear." *United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring); *see also Smith*, 538 U.S. at 105 (explaining that "[t]he excessiveness inquiry of our *ex post facto* jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy," but instead "whether the regulatory means chosen are reasonable in light of the nonpunitive objective").

Third, Mr. McGuire says the residency and employment restrictions are excessive because of the difficulty he had finding a job or a house outside the exclusion zones. With this argument Mr. McGuire again seeks to establish that the residency and employment restrictions are punitive in effect through evidence of the law's effect on himself alone. But, as we explained above, Supreme Court precedent forecloses this argument. *See Young*, 531 U.S. at 262.

On the record before us, we conclude that Mr. McGuire did not establish by the clearest proof that the residency and employment restrictions are so punitive in purpose or effect that they override the Alabama legislature's stated nonpunitive intent.

Accordingly, we affirm the district court's determination that the retroactive application of the residency and employment restrictions does not violate the *Ex Post Facto* Clause.

## 2. Mr. McGuire Failed to Carry His Heavy Burden to Prove that the Homeless Registration Requirement Is Sufficiently Punitive in Purpose or Effect

Next, we address ASORCNA's homeless-reporting requirement. As a refresher, the Act requires homeless registrants to report in person every week and to identify the locations where they resided during the previous week and plan to reside in the upcoming week. *See* Ala. Code § 15-20A-12(b), (d). After considering the *Mendoza-Martinez* factors, we conclude that Mr. McGuire failed to establish by the clearest proof that the homeless registration restriction is so punitive in purpose or effect as to negate the legislature's intent to deem it civil.

### a. Resemblance to a Traditional Punishment

Mr. McGuire argues that the homeless registration requirement resembles the traditional punishment of probation or parole.[30] We disagree.

---

[30] Although in *Smith* the Supreme Court discussed parole, it did not consider whether parole qualified as a traditional or historical punishment. *See* 538 U.S. at 101–02 (considering whether reporting requirements imposed an affirmative disability or restraint similar to probation or parole, not whether probation or parole had been regarded in our history and tradition as a

Probation and parole are closely related punishments.[31] Individuals on probation and parole "do not enjoy the absolute liberty to which every citizen is entitled, but only conditional liberty properly dependent on observance of special probation [or parole] restrictions." *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (alteration adopted) (internal quotation marks omitted). Probation and parole involve a series of mandatory conditions, which may include requiring a person to report regularly to law enforcement and to comply with other conditions including maintaining employment, obtaining consent from a probation or parole officer before moving or changing jobs, and abstaining from drugs or alcohol. *See Shaw*, 823 F.3d at 565. When a probationer or parolee violates the conditions of his probation or parole, the supervising officer seeks revocation in a proceeding that is part of the original

punishment). We assume for purposes of this appeal only that parole would qualify as a traditional or historical punishment. *See Shaw*, 823 F.3d at 565.

[31] Parole refers to "[t]he conditional release of a prisoner from imprisonment before the full sentence has been served" and generally requires "that the parolee regularly report to a supervising officer for a specified period." *Parole*, *Black's Law Dictionary* (11th ed. 2019). Probation refers to "[a] court-imposed criminal sentence that, subject to stated conditions, releases a convicted person into the community instead of sending the criminal to jail or prison, usu[ally] on condition of routinely checking in with a probation officer over a specified period of time." *Probation*, *Black's Law Dictionary* (11th ed. 2019). Succinctly, "[p]arole is based on good conduct in the penitentiary while probation is set as a substitute for incarceration." 59 Am. Jur. 2d Pardon & Parole § 8 (2016).

offense. *See Smith*, 538 U.S. at 102; *Griffin*, 483 U.S. at 874; *Black v. Romano*, 471 U.S. 606, 611 (1985).

It is certainly true that registrants, like probationers and parolees, are subject to periodic reporting requirements. But ASORCNA's homeless registration requirement does not so closely resemble probation or parole that "the public [would] recognize" it as a punishment. *Smith*, 538 U.S. at 97. The homeless registration requirement is markedly different from probation and parole in two ways. First, the registration requirement is limited to a reporting. It does not entail the type of supervision that is a hallmark of probation and parole. Homeless registrants are not, for example, required to maintain employment, obtain consent before moving or changing jobs, or abstain from drugs or alcohol. Second, the consequences of violating the homeless reporting requirement are different from the consequences of probation and parole violations. With probation and parole, a violator of a term or condition of supervision may be imprisoned for the original crime. *See Romano*, 471 U.S. at 609, 611. By contrast, if a homeless registrant fails to comply with the weekly reporting requirement, he may be subjected to a criminal prosecution for violation of ASORCNA, separate and apart from his original offense. *See* Ala. Code § 15-20A-12(f); *see also Smith*, 538 U.S. at 101–02.

### b. Affirmative Disability or Restraint

The second factor requires us to consider whether the homeless reporting requirement imposes an affirmative disability or restraint. Even though the in-person weekly reporting

requirement imposes an affirmative disability or restraint, we cannot say that the requirement is punitive.

In assessing whether the weekly, in-person reporting requirement imposes an affirmative disability or restraint, we look to precedent addressing whether other sex offender registration schemes imposed these burdens. In *Smith*, the Supreme Court held that Alaska's scheme requiring yearly or quarterly registration by mail imposed no affirmative disability or restraint. 538 U.S. at 91, 100–101. Likewise, in *W.B.H.*, we held that a federal law requiring sex offenders to register in person four times per year imposed no affirmative disability or restraint. *See* 664 F.3d at 857–58. Even though the in-person reporting requirement was "inconvenient," we concluded that no affirmative disability or restraint resulted because the quarterly in-person reporting requirement did not prohibit registrants from changing residences, jobs, or student status without prior approval and "only require[d] that changes be reported." *Id.* at 857.

The reasoning in *Smith* and *W.B.H.* perhaps suggests that the homeless reporting requirement imposes no affirmative disability or restraint. True, ASORCNA requires homeless registrants to provide regular updates to law enforcement officers, but they remain able to move into a fixed residence and to change where they stay throughout the week without obtaining prior approval. Still, ASORCNA's weekly reporting requirement is more burdensome than the registration schemes reviewed in *Smith* and

*W.B.H.* because neither case considered a weekly reporting requirement or its effect specifically on homeless individuals.

Given the reporting frequency, we are persuaded that the homeless registration requirement imposes an affirmative disability or restraint. But even considering this factor, we cannot say that the homeless registration requirement is so punitive in effect that it overrides the legislature's nonpunitive intent. *See Hendricks*, 521 U.S. at 363 (explaining that the imposition of an affirmative disability or restraint does not necessarily mean that a restriction is punitive). We must weigh the extent of the disability or restraint that the weekly registration requirement imposes on homeless registrants against the legislature's nonpunitive purpose of protecting the public. *See Miller*, 405 F.3d at 721. As we explain below, the weekly registration requirement has a rational connection to the nonpunitive purpose of protecting the public and is not excessive in relation to that purpose. In the circumstances before us, even though the law imposes an affirmative disability or restraint, we conclude that it is not sufficiently punitive to negate the legislature's intent.

### c.  Traditional Goals of Punishment

Turning to the next factor, we ask whether the homeless registration requirement furthers a traditional goal of punishment. We see no sufficiently strong deterrent or retributive effect to render the homeless registration requirement punitive.

We accept that the requirement has a general deterrent effect by potentially preventing future crime. Indeed, the Alabama legislature expressly stated that it imposed the more frequent reporting requirement for homeless registrants "for the protection of the public," Ala. Code § 15-20A-2(3), suggesting it understood that the reporting requirement would prevent registrants who were homeless from committing future crimes. But *Smith* recognized that governmental programs might deter crime without imposing punishment. 538 U.S. at 102. So it cannot be true that the presence of some general deterrent effect establishes that the registration requirement is punitive. Sex offender restrictions and requirements generally are intended to protect the public by reducing the number of future crimes that sex offenders commit. If that made them punitive, none would survive judicial scrutiny. *See id.* ("To hold that the mere presence of a deterrent purpose renders such sanctions criminal would severely undermine the Government's ability to engage in effective regulation." (alteration adopted) (internal quotation marks omitted)).

We agree with Mr. McGuire that, like the residency and employment restrictions, the homeless registration requirement furthers the goal of retribution to some extent. *See Shaw*, 823 F.3d at 572. For a restriction to be so retributive that it constitutes punishment, though, the statute's effect must "lack[] a reasonable relationship to non[]punitive objectives." *Id.* As we explain when we apply the next factor, the Alabama legislature could rationally set out to protect public safety by requiring weekly registration

from homeless registrants. In light of the rational connection between the reporting requirement and protecting public safety, this factor weighs against a finding of punitive effect.

### d. Rational Connection to a Nonpunitive Purpose

Without a doubt, Alabama's homeless registration requirement has a rational connection to a nonpunitive purpose. As the Supreme Court recognized in *Smith*, requiring registrants to report to law enforcement is rationally connected to the legitimate, nonpunitive purpose of promoting public safety. *See* 538 U.S. at 102–03. It therefore is rational for a state to require registrants to report periodically to law enforcement to verify their information as well as to report when information changes—for example, after changing where they stay.

Relatedly, because homeless registrants lack a fixed address, they may be more transient than other registrants. To ensure that law enforcement and the public have accurate information about these registrants' whereabouts and to protect public safety, a state legislature could rationally conclude that homeless registrants need to report more frequently. *See* Ala. Code § 15-20A-2(3) ("Homeless sex offenders . . . need to be monitored more frequently for the protection of the public."). Whether or not we agree with the legislature's conclusion, it was not an unreasonable one. *See Shaw*, 823 F.3d at 572.

### e. Excessiveness

As to the final factor, Mr. McGuire has not shown that the reporting requirement is excessive. Given the requirement's rational connection to a nonpunitive purpose, Mr. McGuire bears the burden to show that the requirement is nonetheless excessive in relation to this purpose. But he does not argue that the frequency or manner of reporting imposed upon homeless registrants—in-person reporting once per week—is excessive in light of this nonpunitive purpose.[32]

On the record before us, we conclude that Mr. McGuire failed to establish by the clearest proof that the weekly reporting requirement for homeless registrants is sufficiently punitive to negate the Alabama legislature's stated intention to enact a civil regulatory scheme. We thus affirm the district court's judgment

---

[32] On appeal, Mr. McGuire focuses his argument on why it was excessive for Alabama to require homeless registrants who live in cities to report in person *twice* per week (once each week to city law enforcement and once each week to county law enforcement). *See* Appellant's Br. at 34 (arguing that the homeless registrant requirement is excessive because, due to the dual reporting requirement, "homeless registrants must also report twice per week, amounting to a minimum of 112 registrations per year"). But the Alabama legislature has removed the homeless registrants' dual reporting requirement. *See* 2015 Ala. Laws 463. As explained above, we limit our analysis to the version of ASORCNA currently in effect, which requires homeless registrants to report 56 times per year (four quarterly registrations and 52 weekly registrations). *See supra* Section IV.

that the weekly reporting requirement does not violate the *Ex Post Facto* Clause.

### 3. Mr. McGuire Failed to Carry His Heavy Burden to Prove that the Travel Notification Requirement Is Sufficiently Punitive in Purpose or Effect[33]

Next is ASORCNA's travel notification requirement. ASORCNA requires a registrant to provide notice to law enforcement before he may "temporarily leave[]" his county of residence for three or more consecutive days. Ala. Code § 15-20A-15(a). After applying the *Mendoza-Martinez* factors, we conclude that Mr. McGuire has failed to show by the clearest proof that this requirement is punitive.

Mr. McGuire argues that the travel notification provision resembles probation or parole because it (1) bars registrants from spontaneous travel by requiring them to give notice at least three business days before traveling and (2) requires registrants to receive permission before traveling. But because ASORCNA, as

---

[33] We continue to weigh the same factors to evaluate the remaining challenged provisions. But because the parties' arguments for each of the remaining challenged provisions are less complex, we cease using separate subheadings as we discuss each factor.

amended, imposes neither restriction, we hold that it does not resemble probation or parole.[34]

First, Mr. McGuire contends that the travel notification provision restricts registrants from any form of spontaneous travel because they must notify law enforcement at least three business days before traveling. But he slightly misreads ASORCNA with respect to domestic travel. The law permits registrants to give notice *within* three business days of such travel. *Id.* §§ 15-20A-4(9), 15-20A-15(a). Because a registrant may give notice immediately before departing on a trip, we reject Mr. McGuire's argument that the provision resembles probation or parole by restricting spontaneous travel.

Mr. McGuire also argues that because he must disclose in advance where he will be staying, he cannot spontaneously decide to stay at a different hotel or in a different town. Mr. McGuire argues that innocuous changes in travel plans may trigger felony violations. But barring registrants from making spontaneous changes to their travel plans does not mean the travel notification requirement resembles probation or parole. Only "knowing[]" violations of the travel restrictions are punishable as felonies. Ala. Code § 15-20A-15(h). Also, allowing a registrant to travel to a destination different from the one disclosed in advance would

---

[34] As we have mentioned, permission to travel is no longer required in light of the 2017 amendments to ASORCNA, but notification of intent to travel is required. *See* 2017 Ala. Laws 414.

thwart the regulatory purpose of informing local authorities where the registrant would be and allowing them to inform law enforcement in that other location.

Mr. McGuire contends that the travel notification provision resembles probation or parole because it requires registrants to obtain permission from law enforcement before traveling. Under the amended version of ASORCNA, however, no permission is required. A registrant must report to his county sheriff to "complete and sign a travel notification document" before traveling outside his county of residence for three or more days. *Id.* § 15-20A-15(a). But ASORCNA gives the sheriff no discretion or authority to forbid a registrant who completes the travel notification form from leaving the county. *Id.* § 15-20A-15(a), (d). Mr. McGuire's argument that law enforcement might do so rests on unfounded speculation. We therefore reject his argument that this provision resembles probation or parole.

Turning to the second factor, the travel notification provision places some burden on registrants by requiring them to report in person before traveling. But because ASORCNA, in its current form, requires registrants to report in person to law enforcement only once before a trip, we cannot say that the reporting requirement imposes a burden rising to the level of an affirmative disability or restraint. *See W.B.H.*, 664 F.3d at 857 (addressing why in-person reporting requirement did not impose affirmative restraint).

Now the third factor. Even if we assume that the travel notification provision has some deterrent effect, that effect does not make the provision punitive because the "mere presence" of a deterrent effect does not make a statute punitive. *See Smith*, 538 U.S. at 102 (internal quotation marks omitted). Likewise, even if the travel notification serves some retributive purpose, the provision is not punitive because, as we conclude below, it has a rational connection to a nonpunitive purpose and is not excessive. *See id.*

As to the fourth factor, the travel notification requirement has a rational connection to a nonpunitive purpose. The Attorney General argues that requiring a registrant to report travel outside the county "[e]ncourages personal contact with law enforcement" and "[p]rovides for continuity of contact between jurisdictions." Appellees' Br. at 47. In requiring registrants to disclose their travel plans to law enforcement shortly before traveling, the provision serves these rational purposes.

With respect to the final factor, the travel notification provision is not excessive. The provision appropriately serves the purpose of protecting public safety by requiring that registrants give notice shortly before traveling, with some flexibility (within three days) about when the notification must occur. Because the scope of the restriction is "reasonable in light of the nonpunitive objective," *Smith*, 538 U.S. at 105, it is not excessive.

After considering the relevant factors, we conclude that Mr. McGuire has failed to establish by the clearest proof that the travel

notification restriction is so punitive in purpose or effect that it overrides the legislature's stated nonpunitive intent.

4. **Mr. McGuire Failed to Carry His Heavy Burden to Prove that the Direct Community Notification Requirement Is Sufficiently Punitive in Purpose or Effect**

The last provision of ASORCNA Mr. McGuire challenges is the requirement that local law enforcement notify a registrant's neighbors that a sex offender plans to establish or has established a residence nearby. Looking to the Supreme Court's decision in *Smith*, we conclude that Mr. McGuire has failed to show by the clearest proof that this provision is punitive.

Mr. McGuire argues that the direct community notification requirement resembles a traditional shaming punishment. Some historical punishments, like forcing an offender to wear a sign broadcasting his offense, were meant to inflict public disgrace. *See Smith*, 538 U.S. at 97–98. The required community notification bears at least an initial resemblance to traditional shaming punishments. When a registrant establishes a new residence, local law enforcement is to mail or hand deliver to a registrant's neighbors a flyer that discloses the registrant's name, address, photograph, and status as a sex offender.[35] *See* Ala. Code §§ 15-20A-

---

[35] ASORCNA also provides for a second type of community notification through the State's maintenance of an online database for the public to access information about registrants. *See* Ala. Code § 15-20A-8(a). The Supreme Court held in *Smith* that including a registrant's information in an online

8(a), 15-20A-21(a), (b). We recognize that a registrant will likely experience a degree of humiliation and public disgrace when these flyers are distributed to his neighbors. *See Smith*, 538 U.S. at 98 (recognizing registrants may face stigma as a result of the public being notified about their status as sex offenders).

But *Smith* is clear that our inquiry does not end there. Even though the registrants in *Smith* experienced public stigma due to being listed in Alaska's internet database of sex offenders, the Court concluded that Alaska's community notification scheme did not resemble a historical shaming punishment. *Id.* at 98–99. This was because registrants were not subjected to "face-to-face shaming." *Id.* at 98. Instead, any stigma resulted solely "from the dissemination of accurate information about a criminal record, most of which is already public." *Id.* The Court analogized the way

---

database did not resemble a historical shaming punishment. 538 U.S. at 99. *Smith* compels us to conclude that this aspect of Alabama's community notification is nonpunitive.

At least one court has determined that community notification through an internet registry database has a punitive effect. *See, e.g*, *Commonwealth v. Muniz*, 164 A.3d 1189, 1212 (Pa. 2017) (holding that Pennsylvania's community notification requirements violated the *Ex Post Facto* Clauses of the United States and Pennsylvania constitutions when registrants were listed on a public internet website because the publication provision "when viewed in the context of our current internet-based world [is] comparable to shaming punishments"). But even after considering this decision, we conclude that Alabama's use of an online registry is not punitive.

the public could access information in the database to "a visit to an official archive of criminal records" because a member of the public would receive information about a sex offender only after voluntarily taking several steps, including "going to the Department of Public Safety's Web site, proceed[ing] to the sex offender registry, and then look[ing] up the desired information." *Id.* at 99.

The Supreme Court's decision in *Smith* does not answer directly whether ASORCNA's direct community notification resembles public shaming.[36] On the one hand, *Smith*'s discussion of "face-to-face shaming" suggests that ASORCNA's notification

---

[36] Nor does our decision in *W.B.H.* answer whether Alabama's direct community notification provision resembles a historical punishment. In *W.B.H.*, an individual who was required under SORNA to register due to a juvenile conviction for a sex offense claimed that SORNA's community notification requirement was punitive. 664 F.3d at 851. He argued that including his information in a government sex offender database on the internet resembled a traditional shaming punishment because his underlying juvenile conviction for a sex offense was not a public record. *Id.* at 856. We concluded that placing his information in a database would not subject him to face-to-face public shaming. *Id.* We stated that "[e]ven if the fact that a person had been convicted of a sex offense as a youthful offender were to be permanently sealed under state law, dissemination of that truthful information in a [] registry" would not be punitive. *Id.* Because *W.B.H.* involved a challenge to a community notification scheme that involved dissemination of information about registrants through an internet database only, however, the opinion did not address whether direct community notification in which the government, unsolicited, sends out information about a registrant's presence to his neighbors would resemble a traditional shaming punishment.

scheme does not resemble a historical punishment because a registrant ordinarily is not present when his neighbors receive the notice disclosing his status as a sex offender. *Id.* at 98. On the other hand, other parts of *Smith*'s analysis suggest that ASORCNA's requirement does resemble public shaming. Direct community notification under ASORCNA is substantially different from the public's searching out information either online or in a physical archive because information about registrants is automatically sent to their neighbors without requiring the neighbors to take any steps to obtain the information. *See* Ala. Code § 15-20A-21(a). So, the Court's analogy in *Smith* does not hold here.

We leave the difficult question whether the Act's community notification requirement sufficiently resembles historical shaming for another day, however. Even assuming that it does, Mr. McGuire still has not met his heavy burden to show that it is punitive in purpose or effect when we consider the other factors.

For the second factor, the direct community notification requirement does not impose an affirmative disability or restraint. The Supreme Court told us in *Smith* that a community notification provision "imposes no physical restraint." 538 U.S. at 100. And although community notification "may have a lasting and painful impact on the convicted sex offender, these consequences flow not from [ASORCNA's] . . . dissemination provision[], but from the fact of conviction, already a matter of public record." *Id.* at 101.

The third factor, too, weighs in the Attorney General's favor. Even if the community notification requirement has some deterrent effect, some deterrent effect does not establish that the measure is punitive. *See id. at* 102. And even if the community notification requirement in some sense promotes retribution, this factor on its own does not make the requirement punitive. *See id.*

It is beyond dispute that the direct community notification provision meets the fourth factor, a rational connection to a legitimate governmental purpose. It was rational for the Alabama legislature to conclude that requiring law enforcement to notify neighbors, schools, and childcare centers of a registrant's presence would serve the civil purposes of promoting public safety and reducing recidivism.[37] *See* Ala. Code § 15-20A-2(1) ("This release of information creates better awareness and informs the public of the presence of sex offenders in the community, thereby enabling the public to take action to protect themselves."). As the Supreme Court said in *Smith*, such notification "has a legitimate nonpunitive purpose of public safety, which is advanced by alerting the public

---

[37] Some social science research in the record reflects that community notification may reduce recidivism. At the same time, other research of record suggests that community notification fails to reduce the recidivism rate for registrants. At trial, Mr. McGuire's expert discussed some evidence indicating that notification can *increase* recidivism rates by making it more difficult for registrants to find jobs and stable housing and to enter personal or business relationships. We need not resolve the policy dispute about whether community notification actually reduces recidivism because it was rational for Alabama's legislature to determine that it would.

to the risk of sex offenders in their community." 538 U.S. at 102–03 (alteration adopted) (internal quotation marks omitted).

Finally, considering the fifth factor, we conclude that the means of notification Alabama has chosen—mailing and hand delivering flyers identifying the registrant to nearby neighbors, schools, and childcare centers—can reasonably be expected to achieve Alabama's nonpunitive objective of protecting the public. There is no argument here that the direct community notification requirement is excessive due to the formatting of the flyer or the way that it displays information about the registrants. Indeed, a flyer contains only factual information about a registrant, such as his name, race, sex, date of birth, physical description, address, and a brief description of his underlying offense. *See* Ala. Code §§ 15-20A-8, 15-20A-21. The inclusion of this information is entirely consistent with Alabama's stated purpose: to inform the public about the registrant's presence in the community. *See id.* § 15-20A-2(1).

After weighing the factors, we conclude that Mr. McGuire failed to establish by the clearest proof that the direct community notification requirement is so punitive in purpose or effect that it overrides the Alabama legislature's intent to create a civil regulatory scheme. Even if we assume that the direct community notification resembles a historical punishment, we hold that Mr. McGuire failed to carry his heavy burden, particularly given the community notification requirement's rational connection to a nonpunitive purpose that is not excessive in relation to that

purpose.[38] Accordingly, we agree with the district court that the retroactive application of the direct community notification requirement does not violate the *Ex Post Facto* Clause.

## VII.   CONCLUSION

We VACATE the district court's judgment insofar as it involves Mr. McGuire's claims that it is unconstitutional to apply retroactively the following provisions of the Alabama Sex Offender Registration and Community Notification Act, and REMAND WITH INSTRUCTIONS that it dismiss those claims as moot: (1) the identification-labeling requirement and (2) the dual registration requirements for homeless registrants and for registrants providing travel notification.

We AFFIRM the district court's judgment insofar as it rejects Mr. McGuire's claims that it is unconstitutional to apply retroactively the following provisions of ASORCNA: (1) the residency and employment restrictions, (2) the homeless registration requirement, (3) the travel notification requirement, and (4) the community notification requirement.[39]

---

[38] To the extent that it is necessary to do so, and we pass no judgment on whether it is, we have also considered how the community notification provision interacts with other provisions in ASORCNA and conclude that it is not punitive in effect.

[39] Also pending before the Court is Mr. McGuire's motion to dismiss the Attorney General's cross-appeal as moot. Because we have vacated and remanded with instructions to dismiss as moot the part of the district court's judgment challenged in the cross-appeal, we DENY that motion.

VACATED AND REMANDED IN PART, AFFIRMED IN PART.